(Decided May 16th, 1895.)

---

## SAMUEL HAWKINS *vs.* THE STATE OF MARYLAND.

*Quo Warranto to Oust Incumbent from Office—Powers of State's Attorneys.*

A State's Attorney has no authority to institute proceedings in the nature of a *quo warranto* in order to oust an incumbent from a public office.

State's Attorneys in Maryland possess no other powers than those prescribed by the Constitution or by statute.

Appeal from an order of the Circuit Court for Charles County (BRISCOE, C. J., BROOKE and CRANE, JJ.), overruling a demurrer to an information in the nature of *quo warranto* filed by the State's Attorney, and entering a judgment of ouster from the office of County Commissioner against the appellant. The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, McSHERRY, FOWLER, PAGE and BOYD, JJ.

*Bernard Carter* and *L. Allison Wilmer*, for the appellant.

The State's Attorney had no power to institute this proceeding, and the demurrer should have been sustained. It is impossible to find in the judicial history of Maryland any instance of a *quo warranto* by the *Attorney-General* to oust an officer. No Attorney-General of the State has ever supposed that he had any such function. Then, where

does the State's Attorney get his authority to file this information? Except when, and as empowered by statute, no State's Attorney is authorized to institute a criminal proceeding against the humblest individual. And he cannot of his own motion, start an inquiry like this, as to the validity of an Act of the Legislature concerning an office.

It is argued on the other side, that prior to the Constitution of 1851, the Attorney-General of Maryland had, by inheritance, all the powers of the Attorney-General in England, and as that Constitution abolished the office of Attorney-General, and empowered the State's Attorneys to perform its duties, therefore the State's Attorneys now have, under the Constitution of 1867, power to institute a *quo warranto* proceeding. Both the premises and the conclusion are false. In England, the Attorney-General, as representing the King's sovereignty, had that power, but the exercise of it was a matter within his discretion. It was not prescribed by law. In Maryland, before 1851, the Attorney-General was not at large ; his duties were definite and prescribed by law. The power to file an information in the nature of a *quo warranto* was not among these duties. (The argument of counsel as to the validity ot appellant's title to the office in question is omitted.)

*Wm. Pinkney Whyte*, for the appellee.

Under the common law, the Attorney-General had the right, *ex officio*, to file the petition in a case like this. *Com. v. Fowler*, 10 Mass. 290; *Goddard* v. *Smithett*, 3 Gray, 116; *Com.* v. *Allen*, 128 Mass. 310; *Shortt on Informations*, 112, 174; *Atty.-Gen.* v. *Delaware, etc., Co.*, 38 N. J. L. 286; *Rex* v. *Marsden*, 3 Burrows, 1817.

Prior to the Constitution of 1851, the proper law officer of the State was the Attorney-General, who administered his office in the several counties of the State and the city of Baltimore, by his appointees, who were called his deputies. But the office of Attorney-General was abolished by the Constitution of 1851 ; and section 32 of Article 3 pro-

vided, that "no law shall be passed creating the office of
Attorney-General;" and to meet this change in the law
officer of the State, the Constitution in its 5th Article pro-
vided for "*an attorney for the State in each county and the
city of Baltimore, to be styled the State's Attorney;*" and by
the 3d section of that Article, it was provided that the
"State's Attorney *shall perform such duties*, and receive
such fees and commissions as are now provided by law for
the Attorney-General and his deputies." It is clear, there-
fore, that the State's Attorney in each county and the city
of Baltimore was substituted for the Attorney-General in
all the duties which had, prior to 1851, appertained to his
office. The office of Attorney-General has never been re-
stored, in all its former vigor, in this State; it is true, under
the Constitution of 1864, it was revived in a limited degree,
that is to say, Article 5 of that Constitution created the
office of Attorney-General and in its third section defined
the duties of the Attorney-General, but restricted his power
to initiate proceedings to cases where ordered by the Gen-
eral Assembly or Governor. The powers of the State's
Attorneys remained the same. A careful reading of section
3 of Article 5 of the Constitution of 1864 will show that
the Attorney-General has no original power to file informa-
tions, &c., as he had prior to 1851.

No change has been made in the Constitution of 1867, as
to the Attorney-General and the State's Attorneys, and the
provisions relating to said officers are the same as they were
in the Constitution of 1864. The authority of the State's
Attorney for Charles County to institute these proceedings
seems to be fully established.

FOWLER, J., delivered the opinion of the Court.

The appeal in this case presents the question whether
under the laws and Constitution of Maryland, the officer
known as State Attorney has any legal authority to insti-
tute these proceedings, which resulted in ousting the appel-
lant from the office of County Commissioner of Charles

County, which office he claims to hold under the Act of 1894, ch. 215. By virtue of this Act the number of County Commissioners of Charles County was increased from three to five, and the Governor was thereby authorized to appoint "from the legally qualified citizens of said county two persons to serve as County Commissioners of said county, until the general election to be held in November, 1895, or until their successors are duly qualified and elected." In the exercise of the authority thus conferred upon him, the Governor appointed the appellant and the late William H. Trotter, the latter having died subsequent to his appointment and qualification and to the judgment appealed from. The surviving appointee, Samuel Hawkins, is therefore the sole appellant.

The demurrer to the information filed in this case presents the controlling question, and the view we have taken in regard to it, avoids the necessity of considering the other question sought to be presented, namely, the validity *vel non* of the Act of 1894, ch. 215, The Court below overruled the demurrer, declared the Act of 1894 unconstitutional, and gave judgment of ouster against the defendants, and imposed a nominal fine upon them. From this judgment the defendant Hawkins has appealed, and thus the question of the validity of information instituted by the State's Attorney for Charles County is directly presented.

In the discussion of this question it will not be necessary to inquire into the history of the ancient writ of *quo warranto*, for it ceased to exist, and as *Blackstone* says, Book III, page. 263, had fallen into disuse in England even in his time, and had given place to the more modern practice of an information in the nature of a *quo warranto*. This, as Blackstone calls it, "the more modern method," was adopted by the learned State's Attorney for Charles County, and we do not understand that any objection has been made to the form of the information prepared and presented by him, but the contention is that he is absolutely without power to institute such proceedings. With this

view we all agree, and we will state, as briefly as may be, the grounds upon which our conclusion rests.

The Constitution of 1851 provided (Art. 3, sec. 32), that no law should be passed creating the office of Attorney-General, and by Article 5 of the same Constitution, provision was made for the election, compensation and duties of State's Attorneys, section 3 providing that they should "perform such duties and receive such fees and commissions as are *now prescribed by law* for the Attorney-General and his deputies, and such other duties  *  *  as may *hereafter be prescribed by law.*"  It is conceded that the State's Attorney is an officer unknown to the common law, and being an officer in Maryland, created by our Constitution, it follows that his powers and duties, whatever they may be, must be derived either from the Constitution itself or laws passed in pursuance thereof.

The fact that the proceeding which was adopted in this case, has never been heretofore used in this State, except in the manner and for the purpose authorized by the Legislature, renders it exceedingly doubtful whether the right to use it or authorize its use for any purpose exists outside of that body, except as authorized by it.  No instance has been found in our judicial history, where the writ of *quo warranto* or any information in the nature thereof, has ever been used or attempted to be used without Legislative authority by any of the learned members of the profession, who have from time to time, from the earliest days to the present time, filled the high office of Attorney-General of this State.  In addition to this, it has been stated by Chancellor Kilty in his *Report of English Statutes,* page 248 ; by the late Hugh Davey Evans in his work on *Maryland Practice.* pp. 74 and 75, which for many years was a work of the highest authority in this State, and by Mr. Julian Alexander in his valuable collection of *British Statutes in force in Maryland,* p. 695 (note), that we have no proceeding by *quo warranto* in Maryland.  Mr. Evans says: "The information in the nature of a *quo warranto* at common law

would not be adapted to answer the purpose, for which it is so well fitted, when governed by statutes made expressly with a view to those purposes." "It is therefore never resorted to in Maryland, although in some of the other States, particularly in New York, where it has probably been subjected to statutory regulations, it appears to be familiar." And the fact that special provision was made by the Act of 1856, ch. 16 (Code Art. 69, sections 4 and 5), although apparently never availed of for proceeding by *quo warranto*, for the purpose of ousting defaulters from office, would seem to indicate that the power to institute such proceedings against persons holding office without authority of law did not exist, or at least was not supposed to exist outside or and independent of the statute. The sections just referred to, and section 255, Art. 23, giving the Governor power to direct proceedings to forfeit charters of corporations for the causes therein mentioned, are the only provisions of the Code authorizing any proceedings in the nature of *quo warranto* proceedings, and it is not pretended that any of these authorize the proceedings in this case.

Whence, then, is the authority derived? As we understand the argument submitted on the part of the State it is in brief, that before the Constitution of 1851 the officer then known as Attorney-General of Maryland possessed the power now claimed for the State's Attorney, and the office of Attorney-General having been abolished by that Constitution, the duties theretofore exercised by the Attorney-General were by the same Constitution imposed upon the State's Attorney by section 3 of Article 5. And that although the office of Attorney-General was revived in a limited degree by the Constitution of 1864, no change has been made in respect to the duties of State's Attorneys, either by the Constitution last named or by that of 1867. And the conclusion sought to be drawn from this statement is that the duties, which before the Constitution of 1851 were to be performed by the Attorney-General, whether *ex officio* or by virtue of law, are now inherent in and are to be performed by State's Attorney.

Without undertaking to decide whether the power in question, under our present Constitution and laws, is in the Attorney-General, although the argument of the learned counsel for the State concedes that it is not, we think it is very clear that such power is not in the State's Attorney. It must be conceded that the duties of the Attorney-General, which it is contended were imposed on State's Attorneys by the Constitution of 1851, and the subsequent Constitutions, were those only which were then or should thereafter be *prescribed by law. Art.* 5, *sec.* 3, *Const.* 1851. Long prior to the adoption of this Constitution, however, namely, by the Act of 1816, chapter 247, an amendment was submitted to the Constitution of 1776, by which it was provided that the duties of the office of Attorney-General should be performed by such persons and in such manner as the General Assembly should thereafter direct. And by the Act of 1817 this amendment to the Constitution was ratified. By the Act of 1821 (1 Dorsey, Laws, p. 767), the duties of the Attorney-General was prescribed, and that Act remained in full force until the Constitution of 1851 was adopted. But we may search in vain for any law or Act of Assembly giving the power to or imposing the duty upon the Attorney-General to institute a *quo warranto* proceeding or any proceeding in the nature of it. See also 3 *Dorsey Laws,* p. 2464; Index, Title, "Attorney-General," and the Act of 1832, ch. 306, (2 *Dorsey's Laws,* p. 1098), providing for proceedings against corporations when authorized by the General Assembly. It appears to have been one of the conceded powers of the Attorney-General in England, *ex officio,* without the leave of any one, to institute such proceedings as the Attorney-General of Maryland was authorized to take by the Act of 1832, just referred to; but it was held by this Court in *State* v. *Consolidated Coal Company,* 46 Md. 1, that neither the Attorney-General of this State, nor the Governor, nor any other officer, has the right to institute *scire facias* or any other proceeding for the purpose of forfeiting charters of corporations without legis-

lative authority. Such authority, as we have seen, was given to the Attorney-General by the Act of 1832, ch. 306, and to the Governor by the Act of 1868, ch. 471, sec. 176 (Code, Art. 23, sec. 255.) It appearing, therefore, that the Attorney-General never had the power, nor was it ever made one of his duties by any constitution or law in force in Maryland, to issue the writ of *quo warranto* or to institute proceedings in the nature thereof, and the duties of that officer which were *prescribed by law*, being the only duties which were imposed on State's Attorneys by the Constitution of 1851, and the power claimed not having been given to State's Attorneys, and the duty in question not having been imposed upon them by any Constitution since that of 1851, nor by any law of this State, they do not possess the power, and, therefore, it is not one of their duties to exercise it. Nor do these officers possess this power by the common law of England, for they are unknown to it; nor by the common law of this State, for both they and the power claimed for them are unknown to it.

Inasmuch as we do not now dispose of the question as to the right of the Attorney-General, *ex officio*, to institute proceedings like this, it will not be necessary to comment on the numerous authorities cited to establish that proposition. Nor need we refer to the authorities cited to show that the proceeding here adopted is an appropriate one for the purpose sought to be attained. As we have said, the objection on which the demurrer is based goes not to the form of the action, but to the power of the State's officer to institute it.

The Maryland cases referred to, we do not think are properly applicable to the question here presented. In *Regents* v. *Williams*, 9 G. & J. 426, it is said that there are two modes of proceeding judicially to ascertain and enforce the forfeiture of a charter. The one is by *scire facias*, and the other by *quo warranto*. There is no doubt but that these remedies are appropriate, respectively, to the several conditions mentioned by the Court in that case, but, as we

have seen, neither can be used without the express legisla-
tive authority.   *State* v. *Consolidated Coal Co.*, *supra.* In
the case of *Harwood & Marshall*, 9 Md. 99, it was held
that *mandamus* was the appropriate remedy for a party who
claims title to an office, and asks for the removal of the
occupant, and it being objected that *mandamus* did not lie
because there was another legal remedy, to-wit, *quo war-
ranto*, the Court, assuming that it was an available remedy
in such a case in Maryland, said that it was neither specific,
nor was it adequate to the object in view in that case.   We
do not understand the Court to say that *quo warranto*, or
an information of that nature had ever been resorted to in
Maryland to remove one from a public office which he was
illegally holding, for such is not the fact, as we have seen.
All that was said by the Court in that case, in this connec-
tion, was for the purpose of meeting the suggestion that
*quo warranto* was a legal remedy, and that; therefore, *man-
damus* would not lie.   We think a conclusive answer to this
suggestion would have been that the proceeding suggested
in lieu of *mandamus* had never been authorized by the
Legislature to be used in such a case in Maryland.

*Reversed without a new trial.*

(Decided June 18th, 1895.)